

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRAIG BRYAN NORTHINGTON,

Plaintiff,

v.

KATHLEEN HAWK-SAWYER, et al.,

Defendants.

No. CV 04-1032 CBM (MLGx)

**FINDINGS OF FACT**
**CONCLUSIONS OF LAW**

Trial Date:   April 30, 2013

Courtroom:  Hon. Consuelo B. Marshall

1

1    This case was tried to the Court on Plaintiff's dental and medical

2  malpractice claims.  The dental malpractice claim involves whether protruding

3  bits of bone and broken teeth, and a buccal plate fracture, as a result of a dental

4  procedure constitute malpractice.  The medical malpractice claim is based on the

5  failure to treat Plaintiff Craig Northington's ("Plaintiff") liver disease.  This Court

6  previously limited Plaintiff's medical malpractice claim to January 19, 2001

7  through February 20, 2003.  [*See* Docket No. 362.]  The Court previously found

8  that Plaintiff's negligence and intentional infliction of emotional distress claims

9  are unexhausted.  [*Id*.]  The Court has considered memoranda, trial briefs, witness

10  testimony, and other evidence, as well as the oral argument of counsel and issues

11  the following facts and conclusions herewith.

12    At trial, Defendants made a motion for Judgment on Partial Findings for

13  both medical and dental malpractice.  *See* Fed. R. Civ. P. 52(c).  Plaintiff did not

14  call a dental expert to substantiate its dental malpractice claim.  Additionally, the

15  Court finds that protruding bits of bone and broken teeth and a buccal plate

16  fracture resulting from a dental procedure is not within the "common knowledge

17  of laymen" and therefore requires expert testimony.  *See Flowers v. Torrance*

18  *Mem'l Hosp. Med. Ctr.*, 8 Cal. 4th 992, 884 P.2d 142 (1994).  Therefore, the Court

19  GRANTS the Defendant's 52(c) Motion only as to the claim for dental

20  malpractice for lack of expert testimony.  Plaintiff's medical malpractice claim is

21  the only remaining claim and the United States of America is the only remaining

22  Defendant.

23    Plaintiff's medical expert, Dr. Fox has training and experience in internal

24  and emergency medicine, as well as pharmacology, is currently licensed in the

25  state of California, and is board certified in internal medicine.  He reviewed

26  Plaintiff's medical documents from late 1990's and 2000's, administered physical

27  examinations of Plaintiff in late 2011 or early 2012,  and during the week of April

28  22, 2013, approximately one week prior to the commencement of trial.  He also

testified at trial.

Defendants presented numerous percipient witnesses relevant to Plaintiff's medical malpractice claim, including Bureau of Prisons ("BOP") doctors Richard Gross, Sterling Pollock, Michael Nelson, and Chris Sigurtson, and Eric Jahnke (a consulting gastroenterologist to the BOP).

Plaintiff has end stage liver disease, a severe case of diabetes, a spontaneous bacterial infection, neuropathy, varices, and encephalopathy.

When Plaintiff first appeared before the Court, he advised the Court that he suffered from liver disease, needed a liver transplant, and it was his understanding that it was BOP's policy not to provide transplants to inmates. This Court Ordered on December 15, 2004 and October 14, 2011 the BOP to provide Plaintiff with a liver transplant evaluation. [Doc. Nos. 73, 256.] The BOP finally complied with the Court's Orders in January 2012. [*See* Doc. Nos. 256, 278.]

## I.    FINDINGS OF FACT

**1.**    Plaintiff Craig Bryan Northington is a citizen of the United States and of the State of California. At all times relevant to this case, Mr. Northington was incarcerated in Santa Ana City Jail; MDC Los Angeles; Douglas County Jail in Castle Rock, Colorado; Federal Medical Center in Rochester, Minnesota ("FMC Rochester"); the Federal Detention Center in Littleton, Colorado ("FCI Englewood"); and United States Penitentiary in Lompoc ("USP Lompoc").

**2.**    Prior to June 2000, Plaintiff was diagnosed with chronic Hepatitis Virus C ("HVC") infection, Grade III, and Stage 3 to Stage 4 liver disease.

**3.**    On June 15, 2000, Plaintiff was taken into custody at the Federal Detention Unit at the Santa Ana City Jail in Santa Ana, California, informed medical personnel there of his HVC, and liver disease with cirrhosis but was not treated for these conditions.

**4.**    In August 2000, Plaintiff was transferred to MDC Los Angeles and was placed in the medical/psychiatric unit but was not treated for HVC or liver disease,

1   despite his request.

2   **5.**     In September 2000, Plaintiff was transferred to the Douglas County Jail in

3   Castle Rock, Colorado.  Plaintiff informed medical personnel of his medical

4   conditions but was not treated because they had not received his medical records.

5   **6.**     On November 14, 2000, a United States District Court Judge in the District

6   of Colorado ordered Plaintiff be sent to a BOP facility for "medical evaluation and

7   treatment, only, and not conduct any mental testing or evaluation."  Exh. 291.

8   **Plaintiff's Medical Care at the Federal Medical Center in Rochester,**

9   **Minnesota from December 2000 to February 2002**

10   **7.**     In December 2000, Plaintiff was transferred to FMC Rochester for

11   evaluation and treatment of his medical conditions.  While there, Plaintiff had

12   medical consultations with Dr. Sigurtson, a psychiatrist, and Dr. Cygnor, a

13   medical officer.

14   **8.**     Dr. Sigurtson assists physicians at FMC Rochester in determining whether

15   patients' mental health renders them good candidates for interferon and ribavirin

16   treatment.  In her Report, after examining Plaintiff Dr. Sigurtson states that she

17   saw Plaintiff because she became aware that he was taking psychiatric

18   medications.  Exh. 248.

19   **9.**     Dr. Sigurtson evaluated Plaintiff's current mental state and asked about his

20   suicide attempts, substance abuse, and paid attention to his pattern of speech.  In

21   her report, she wrote that Plaintiff reports some depression, a history of suicide

22   attempts, and the conversation had "many negative comments about depression

23   and his own feelings of the 'depths of my despair.'"  Exh. 248-4.  She also stated

24   that Plaintiff "currently reports some depression….[h]e does not currently feel

25   suicidal and volunteered that he would be happy to talk with me if he developed

26   any thoughts of suicide."  *Id*.  It also states that Plaintiff understands that

27   psychiatric and psychological services are available should he experience

28   emotional problems.  *Id*.  Dr. Sigurtson stated in her report that Plaintiff "has

4

hepatitis C and is medically stable [and] [n]o medical interventions are planned at this time." *Id*.  Dr. Sigurtson recommended that Plaintiff should continue his current medications.  *Id*.  It is not clear to the Court whether no medical interventions were planned due to the Plaintiff's depressive symptoms or for some other reason.  Dr. Sigurtson testified at trial that Plaintiff was not an appropriate candidate for interferon and ribavirin treatment.

**10.**    On January 19, 2001, Dr. Cygnor wrote a memorandum to Dan Moen, the FMC Rochester case manager.  In the memorandum, Dr. Cygnor states that Plaintiff was "referred to Psychiatry to rule out significant depression" and that the "Psychiatrist's impression is that he has bipolar disorder and that he currently has some depression."  Exh. 249.  Dr. Cygnor concluded that Plaintiff "would not be a good candidate for treatment of his chronic hepatitis C with alpha-interferon and ribavirin because of the advanced stage of his disease and the likelihood that treatment would aggravate his depression.  Prognosis, therefore, is poor."  *Id*.  Dr. Cygnor testified that the kind of treatment available in 2001 was alpha-interferon treatment, and in 2003, pegylated and alpha-interferon treatments were available.

**11.**    Dr. Sigurtson testified that it was appropriate for Dr. Cygnor to recommend that Plaintiff receive no interferon treatment for his HVC and liver disease because treating a person with a history of depression makes it more likely that the depression will be exacerbated.  She also stated that Dr. Cygnor used the appropriate standard of care in treating Plaintiff.  *Id*.

**12.**    Dr. Fox testified that Plaintiff's depression was not an "absolute contraindication" that would bar treatment, but rather, a condition that would allow treatment.  He testified that it would be a "relative contraindication," which means one can treat a patient with interferon and ribavirin but be cautious about any negative effects due to the treatment, including monitoring the depression that the doctors are concerned may be aggravated due to the treatment.   He also testified that when Plaintiff was eventually treated with interferon, his depression

5

did not change very much and that subsequent psychological evaluations suggested a diagnosis other than depression. He opined that HVC can lead to death and if treated early and quickly, one can have a normal life expectancy.

**13.** Dr. Fox stated that the community standard in 2000 was to provide interferon and ribavirin as treatment for HVC. He opined that in his professional opinion, the sooner one is treated for HVC, the better the patient will be, and that Dr. Cygnor was not correct in denying interferon treatment to Plaintiff. He also opined that Dr. Cygnor's failure to treat with interferon and ribavirin fell below the applicable standard of care.

**14.** Dr. Nelson, the current clinical director at FMC Rochester, is board-certified in Family Practice, and was involved in writing the BOP clinical practice guidelines for hepatitis, diabetes, and hypertension between the years of 2001 and 2009. He stated that the guidelines always followed the "community standard of care." Dr. Nelson was also involved with the transplant review panel at the BOP. In preparation for trial, he reviewed records at the BOP, including Plaintiff's administrative claims and responses and Dr. Gross' deposition and declaration.

**15.** Dr. Nelson testified that in 2001 treatment of HVC was still in its infancy, as physicians had just started combining interferon with ribavirin and that therefore that treatment at the BOP required the BOP central office to review requests for interferon and ribavirin treatment. At the time, interferon ribavirin therapy was the recommended treatment, particularly for many inmates who would be incarcerated for long periods of time with the BOP. He also stated that it was desirable to treat at the earliest possible stage. However, 20% of individuals on interferon treatment also take antidepressants.

**16.** Dr. Nelson testified that any patient that is taking medications should be evaluated closely and monitored, and one should not do anything that could aggravate their symptoms. Dr. Nelson opined that it was appropriate for Dr. Cygnor to take into consideration Plaintiff's psychological issues in determining

whether interferon treatment was appropriate.  Dr. Nelson's professional opinion was that the delay in treating Plaintiff from early 2001 to early 2003 did not cause Plaintiff any harm and that in his professional opinion Dr. Cygnor met the standard of care for doctors within his profession.

**17.**    On March 23, 2001, a United States District Judge in the District of Colorado Ordered that a psychological examination be undertaken to determine Plaintiff's competency to stand trial and that the exam and report be performed at FMC Rochester.  *See* Exh. 292.

**18.**    On May 21, 2001, Dr. Cygnor authored a transfer summary.  *See* Exh. 251. The transfer summary included a report of a February 13, 2001 consultation with the Mayo Clinic Gastroenterology department.  *See* Exh. 251.  Dr. Nelson testified that the specialists at the Mayo Clinic are world-renowned for treatment of liver disease.  The summary of the findings of the Mayo Clinic include a review of Dr. Nelson's liver biopsy slides to confirm "grade 2 chronic hepatitis with stage III to IV fibrosis." *Id.*  The Clinic further reported that a "[p]hysical examination revealed no evidence of ascites or other markers of hepatic cirrhosis," that there was "no evidence of esophageal varices or hepatic gastropathy; duodenum was normal," and an ultrasound showed a "normal appearance of the liver, gall bladder, and right kidney, and pancreas." *Id.*  Dr. Nelson further stated that there was no reference to treatment by interferon or ribavirin by the Mayo Clinic.  The transfer summary also stated that "although [Plaintiff] continues to be somewhat depressed, he is now competent for his court appearance." *Id.*

**19.**    Dr. Nelson testified that a transfer summary is authored when an inmate is moved between facilities so that all of that inmate's medical records do not have to be sent to the transferee facility.  Dr. Nelson also testified that BOP policy states a facility that receives a transfer summary for an inmate is not bound by the findings made by medical providers at the previous facility.

**20.**    Dr. Nelson further testified that since Plaintiff was not yet sentenced while

7

at FMC Rochester, the United States Marshals had control over Plaintiff, not the BOP or FMC Rochester and that inmates in the Marshal's custody are sent to FMC Rochester for specific time-limited evaluations based on statutes, and these evaluations come with a requirement to submit a written report to the Court.

**21.**     Dr. Jahnke is a gasteroenterologist, which is a specialty that deals with diseases of the gastrointestinal tract, which includes stomach, esophagus, colon, liver, pancreas.  He served as the outside medical consultant on behalf of the BOP regarding Plaintiff from 2002 to 2006.  Exh. 9.  Dr. Jahnke testified that Dr. Sigurtson and Dr. Cygnor's decision not to commence interferon and ribavirin treatment was appropriate, and it did not fall below the medical community standard of care.  He also testified that a physician would not want to interrupt interferon and ribavirin treatment because it is rigorous and akin to chemotherapy.

**22.**     Dr. Jahnke testified that depression is exacerbated by interferon treatment. He also testified that Plaintiff would require a psychiatric evaluation prior to interferon treatment.

**23.**     The Court finds that United States still had an obligation to provide medical treatment to the Plaintiff and the failure to treat Plaintiff after that psychological examination ordered by the District Court Judge in Colorado was not justified. (*See* Finding of Fact #17.)

**24.**     Plaintiff never received interferon treatment for his HVC and liver disease at FMC Rochester.

**Plaintiff's Medical Care at the FDC in Englewood/Littleton, Colorado from May 2001 to February 2002**

**25.**     Plaintiff was transferred to FCI Englewood in May 2001.

**26.**     On or about May 15, 2001, Plaintiff informed FCI Englewood Chief Medical Officer, Dr. Thomas Krause, that he needed medical treatment for his HVC infection and advanced liver disease.

**27.**     In response, Dr. Krause told Plaintiff that pretrial detainees are not eligible

for interferon treatment, and that Plaintiff would have to demonstrate six months of sobriety.  Plaintiff informed Dr. Krause that he had already been in custody for eighteen months.  Dr. Krause denied Plaintiff interferon and ribavirin treatment.

**28.**     Dr. Fox opined that there is evidence of Plaintiff's deterioration of his liver condition due to lack of treatment between 2000 and 2002.

**Plaintiff's Medical Care at USP Lompoc in Lompoc, California from February 2002 to February 20, 2003**

**29.**     In February 2002, Plaintiff was transferred to USP Lompoc, where he informed medical personnel of his HVC and liver disease.  While there, Plaintiff was seen by Dr. Gross, a medical officer and staff physician in the Health Services Unit, Dr. Jahnke, a gastroenterologist, and other medical staff.  Dr. Gross completed residencies in Internal Medicine and practiced Internal Medicine.

**30.**     On February 8, 2002, Plaintiff was given a medical examination, which confirmed HVC and cirrhosis and that he suffered from depression.  *See* Exh. 275-98.

**31.**     Dr. Gross testified that he first saw Plaintiff on March 22, 2002, reviewed the records from FMC Rochester and FCI Englewood, agreed with the prior recommendation that Plaintiff is not a good candidate for the interferon and ribavirin treatment due to the Federal Drug Administration's "black box warning [regarding] interferon [treatment] with regard to depression."  Exh. 275-91.

**32.**     Dr. Gross saw Plaintiff again on April 8, 2002, and he continued to find that Plaintiff is not an appropriate candidate for interferon and ribavirin treatment.

**33.**     Dr. Gross stated that Plaintiff was seen by medical staff on April 23, 2002, and that a gastroenterology consult was initiated on that date for the purpose of evaluating Plaintiff for his HVC and liver disease.

**34.**     Dr. Gross stated that Plaintiff was seen by medical staff on May 6, 2002, and that there was nothing indicating that Plaintiff's condition had deteriorated since his first consult with Plaintiff in March.  *See* Exh. 275-87.

**35.** Plaintiff was also seen by Dr. Gross and medical staff on June 24, 2002. During that consult, Dr. Gross ordered a follow-up computerized tomography scan ("CT Scan") to reevaluate Plaintiff's liver, and lab work, as the last scan that was done was over one year ago. Dr. Gross also stated that the consult with the gastroenterologist was still pending. Dr. Gross stated that it was important for Plaintiff to first see the gastroenterologist to have various procedures done prior to being recommended for interferon treatment. *See* Exh. 275-85; 275-86. Dr. Gross also testified, he was waiting to receive medical records from the state facility in Colorado, and that such records would have been helpful to Plaintiff's diagnosis.

**36.** Dr. Gross also testified that at the time of the June 24 visit, Plaintiff's condition had not deteriorated since the March consult, and cited Dr. Cygnor's report that Plaintiff was still not a good candidate for treatment with interferon.

**37.** Dr. Gross also saw Plaintiff on July 9, 2002, he informed Plaintiff that he was still awaiting medical records from Colorado and that the gastroenterology consult, a CT Scan, a GI evaluation, and a lab result were pending. Dr. Gross also checked for ascites during this visit, but Plaintiff did not clinically present ascites. He also testified that there it was not urgent for Plaintiff to be seen for a consult for HVC.

**38.** On July 23, 2002, Dr. Gross saw Plaintiff because Plaintiff complained of nausea. He performed a CT Scan of the abdomen (*see* Exh. 275-77), and he testified that there was nothing in the CT Scan that would have precluded interferon treatment.

**39.** On August 2, 2002, Dr. Jahnke saw Plaintiff for a consult regarding his HVC condition.

**40.** Dr. Jahnke conducted an evaluation of Plaintiff and submitted his results to Dr. Sterling Pollock on August 2, 2002. *See* Exh. 284. Dr. Pollock, M.D., was the Clinical Director of the Health Services Unit at USP Lompoc. Exh. 5. In this report, Dr. Jahnke assessed Plaintiff, and stated that the issue of pegylated

interferon and ribavirin therapy was discussed with the patient, that laboratory data will be reviewed, and that "major holdup may be the patient's underlying depressive affect." Exh. 284 at 5. Dr. Jahnke also stated that therefore Plaintiff "may not tolerate[] pegylated interferon." *Id*. He recommended to "consider pegylated interferon, ribavirin therapy" and to "consider antidepressant therapy in light of depressive affect." *Id*. at 6.

**41.** Dr. Gross saw Plaintiff on August 6, 2002, which was immediately after Plaintiff's consult with Dr. Jahnke. Dr. Gross indicated that after the consult, Dr. Jahnke requested that Plaintiff undergo an upper and lower endoscopy for purposes of treating his HVC. Dr. Gross testified that the approximately four-month waiting period for a gastroenterology consult was a normal timeframe.

**42.** Dr. Gross saw Plaintiff on September 9, 2002, and that at that time, the GI tests were pending, and that there was no indication to Dr. Gross that Plaintiff's condition was deteriorating since Dr. Gross first saw Plaintiff in March.

**43.** During Dr. Gross' consult with Plaintiff on October 8, 2002, Dr. Gross cited the notes from Dr. Jahnke, which stated that the upper endoscopy did not show any abnormalities, and Dr. Gross also stated that Plaintiff's condition had not deteriorated since March. *See* Exh. 275-72.

**44.** Subsequent to the review of Dr. Jahnke's report, Dr. Gross received reports from the Bureau of Prisons' Chief Psychologist Dr. Joseph Kerr. Dr. Gross stated that it was both the medical community standard of care and Bureau of Prisons protocol to obtain a psychological assessment prior to considering inmates for interferon and ribavirin treatment. Dr. Gross testified that in the BOP, a psychological assessment is required to be submitted to the BOP central office in Washington, D.C. prior to the office authorizing the interferon and ribavirin treatment.

**45.** Dr. Kerr's report, dated November 18, 2002, states that "there appears to be no psychological reason to deny interferon treatment." Exh. 258-3.

**46.**     On December 6, 2002, Dr. Jahnke made a recommendation to Dr. Pollock to start Plaintiff on interferon treatment, rather than pegylated interferon treatment, because pegylated interferon was not available at the Federal Correctional Institution at that time.  Exh. 284-15.

**47.**     On January 3, 2003, Dr. Gross had a consult with Plaintiff.  During that consultation, Dr. Gross informed Plaintiff that the paperwork to approve Plaintiff for interferon treatment had been submitted to the Bureau of Prisons office.  On the date of that consultation, Dr. Gross did not see any deterioration in Plaintiff's condition since March 2002.

**48.**     On January 28, 2003, Dr. Gross had a consult with Plaintiff and notified him that he had received approval for the pegylated interferon and ribavirin treatment, which had just been approved by the Bureau of Prisons, and he indicated that this is the treatment that is to be provided to Plaintiff.

**49.**     Plaintiff first received pegylated interferon and ribavirin treatment on February 20, 2003.

**50.**     Dr. Fox, Plaintiff's medical expert, opined that Dr. Gross evaluated Plaintiff's HVC condition in a "delayed fashion" given the near six-month delay between Plaintiff's arrival at USP Lompoc in February 2002 and seeing Dr. Jahnke in August 2002.  He also opined that Dr. Kerr's conclusion affirmed Dr. Fox's opinion that though Plaintiff had some form of depression in the past, his condition did not prevent him from receiving interferon and ribavirin treatment. He also opined that had Plaintiff been treated earlier, many of his subsequent liver problems would have been cured.

## II.     CONCLUSIONS OF LAW

**51.**     The facts, insofar as they may be conclusions of law, are hereby incorporated by reference.

**52.**     The Federal Tort Claims Act ("FTCA") provides that Defendant is liable to Plaintiff for damages if any person acting on behalf of Defendant is found to have

intentionally or negligently injured Plaintiff while acting in the scope of his or her employment.  28 U.S.C. § 1346(b); *United States v. Olson*, 546 U.S. 43, 44 (2005).

**53.**     Prior to filing suit, the Administrative Claim Procedure of the FTCA requires a plaintiff to provide, in writing, (a) notice of the manner and general circumstances of the medical and dental injuries he suffered and (b) a demand for sums certain representing damages.  *Blair v. I.R.S.*, 304 F.3d 861, 865 (9th Cir. 2002).  Plaintiff complied with these requirements by providing the Bureau of Prisons ("BOP") with written notice of his claims and requesting specific amounts for damages only as to his medical and dental malpractice claims.

**54.**     Plaintiff's FTCA medical malpractice claim is governed by California law. *Molzof v. United States*, 502 U.S. 301, 305 (1992).

**55.**     Under California law, the elements of malpractice are (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. *Hanson v. Grode*, 76 Cal. App. 4th 601, 606 (1999).

**56.**     "[T]he standard of care for physicians is the reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of the medical profession under similar circumstances. The test for determining familiarity with the standard of care is knowledge of similar conditions." *Avivi v. Centro Medico Urgente Medical Center*, 159 Cal.App.4th 463, 470–471 (2008) (italics and internal citations omitted).

**57.**     Defendant had knowledge that plaintiff suffered from HVC and liver disease as early as December 2000 and knew that the professional standard in the medical community for treatment of such disease was interferon and ribavirin. (*See* Findings of Fact 10, 11.)

13

**58.**     Defendant breached the duty of care for physicians in the medical community by failing to treat Plaintiff's liver disease with interferon with close monitoring of Plaintiff's depressive symptoms.  This fell below the applicable standard of care in the medical community.

**59.**     Plaintiff's condition deteriorated between 2000 and 2003 because of defendant's failure to treat Plaintiff's HVC and liver disease.

**60.**     The failure to treat was the proximate cause of the deterioration of plaintiff's condition.  (*See* Finding of Fact 28.)

**61.**     Plaintiff endured pain and suffering as a result of the failure to treat.

**62.**     Plaintiff satisfied his burden of proof by preponderance of the evidence as to his medical malpractice against the United States.

**63.**     The Court awards damages in the amount of $50,000 for plaintiff's injury between his psychological examination (March 23, 2001) until plaintiff first received treatment for his liver disease (February 20, 2003).

**IT IS SO ORDERED.**

DATED:  February 20, 2014

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

14